**Homer McCLARTY, as trustee in bankruptcy for Maridarlene Fortney, Plaintiff,**

v.

**Dale GUDENAU and Sullivan, Ward, Bone, Tyler & Asher, P.C., Defendants.**

No. 93–CV–73427–DT.

United States District Court, E.D. Michigan, Southern Division.

Oct. 7, 1994.

Lawrence S. Charfoos, Detroit, MI, for plaintiff.

Morton Collins, Southfield, MI, for defendants.

## OPINION AND ORDER REGARDING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

ROSEN, District Judge.

### I. INTRODUCTION

On June 11, 1993, Plaintiff Homer McClarty, on behalf of the bankruptcy estate of Debtor Maridarlene Fortney, filed a one-count complaint against Defendants, Dale Gudenau, Esq., and his law firm, Sullivan, Ward, Bone, Tyler & Asher, P.C. In his complaint, Plaintiff alleged that Mr. Gudenau committed legal malpractice in his representation of Mrs. Fortney in a civil action brought by Gerald and Rebecca McNaughton to recover for injuries sustained as a result of Mrs. Fortney's negligent operation of her car. *See McNaughton v. Fortney,* 89–924790–NI (Wayne County Circuit Court, 1991) (Colombo, J.). After a jury trial, Judge Colombo entered judgment against Mrs. Fortney in the amount of $1,000,000.

Mrs. Fortney's failure to satisfy this judgment prompted her on September 4, 1992, to seek bankruptcy protection under Chapter 7 of the U.S. Bankruptcy Code. *See In re Fortney,* No. 92–11134–S (Bankr.E.D.Mich. 1992) (Shapero, J.). Plaintiff McClarty originally filed this action as an adversary proceeding in Bankruptcy Judge Shapero's court. However, because Plaintiff made a jury demand and because the Sixth Circuit has held that jury trials cannot be conducted by U.S. Bankruptcy Judges, Judge Shapero transferred this case to this Court on August 16, 1993.

After extensive discovery, Defendants filed a motion for summary judgment on April 14, 1994. Plaintiff responded on May 6, and Defendants replied on May 20.[1] After reviewing the papers filed by the parties and the arguments made by their counsel in a hearing conducted on September 14, 1994, the Court is now prepared to rule on Defen-

---

1. Defendants filed a supplemental memorandum in support of their motion for summary judgment on September 6, 1994. Defendants did not seek leave of this Court to file this brief, and the Local Rules for the Eastern District of Michigan do not countenance such additional (and last-minute) submissions. Thus, the Court will not consider the arguments raised in Defendants' supplemental memorandum.

dants' motion. This memorandum opinion and order sets forth that ruling.

## II. *FACTUAL BACKGROUND*

On Thursday, August 24, 1989, Mrs. Fortney ran a stop sign on Northline Road in Taylor, Michigan, and struck Mr. McNaughton as he was driving through the intersection. This accident caused Mr. McNaughton serious injuries, and on November 3, 1989, he and his wife brought suit against Mrs. Fortney seeking damages caused by Mrs. Fortney's negligence. The McNaughtons later amended their complaint to add a separate count alleging vicarious liability on the part of Mrs. Fortney's employer, Sealy Mattress Company ("Sealy"). *See* Defendants' Brief, Ex. D (first amended complaint in the *McNaughton* case).

Shortly after this action was filed, Farm Bureau Insurance Company, the issuer of Mrs. Fortney's personal automobile insurance policy, appointed Mr. Gudenau to represent Mrs. Fortney. The Farm Bureau policy had a $250,000 maximum payment for personal injuries caused by Mrs. Fortney.

At the time of the accident, Mrs. Fortney worked as a sales representative for Sealy. Her position entailed creating advertisements, training salespeople and selling merchandise by travelling to retail stores to acquaint them with Sealy's products. *See* Defendants' Brief, Ex. C, pp. 5–6 (Fortney April 16, 1990 deposition). Although Mrs. Fortney's office was located in her Waterford, Michigan home, she spent a great deal of her time on the road visiting Sealy clients. When driving, she used a car that she leased in her name. Mrs. Fortney was compensated on a straight commission basis, and she picked up all of her expenses, with the exception of Sealy sponsored dinners. Importantly, Mrs. Fortney noted at least some of the miles that she drove on the date of the accident in what is apparently her mileage expense log. *See* Plaintiff's Response Brief, Ex. G. (noting 162.8 miles of travel on August 24, 1989).

In a deposition taken in preparation for the *McNaughton* trial, Mrs. Fortney conceded that she ran a stop sign just prior to crashing into Mr. McNaughton. *See* Defen-

dants' Brief, Ex. C, p. 10. She also gave the following testimony regarding the facts underlying the legal question of whether she was acting in the scope of her employment at the time of the accident:

Q: [By Charles Glass, attorney for the McNaughtons] [W]ere you working at the time [of the accident]?

A: No.

Q. What was—where were you, where had you been?

A. I was on my way down to a [Mattress Warehouse store] on Northline Road [in Taylor, Michigan] to pick up a futon at the time; I was having company coming for the weekend....

\*　　\*　　\*　　\*　　\*　　\*

Q: And where had you been or where were you coming from, from your home?

A: From home.

Q: Going to where?

A: To Mattress Warehouse. They had a warehouse building down there and I was purchasing something from them.

Q: Had you made any calls on this day on behalf of your employer, done anything for them?

A: No. No, not that day.

Q: Why was it—

A: Oh, wait a minute. Are you saying did I talk, did I go to any stores that day?

Q: Yes.

A: Yes, I did stop at one store on the way down.

Q: Alright. On the way down?

A: Yes.

Q: Alright. What store did you stop at?

A: At Mattress Warehouse in Livonia.

\*　　\*　　\*　　\*　　\*　　\*

Q: Okay. And were you coming from there then?

A: Right. I was just making one call that day because I had company coming in.

Q: And then you were going over to this other place?

A: To the warehouse to pick up a futon.

Q: Had you planned to go anywhere else after picking up the futon?

A: No.

Q: Would you have made any phone calls or done anything else on behalf of your employer after picking up the futon?

A: Oh, I would have certainly. When I got back to my home office I would have called in for messages.

Q. What's your home office, in your home?

A. Yes.

\* \* \* \* \* \*

Q. Okay. Is that part of your routine, would be once if you are on the road would you call in when you get back home again to check in to see what may be waiting for you at the office?

A. If I was travelling, yes.

Defendants' Brief, Ex. C at 6–7, 16–18. Importantly, both Mattress Warehouse locations that Mrs. Fortney visited or was planning to visit the day of the accident were business clients of hers.

Although Mrs. Fortney was, by her own admission, negligent in her driving on the day of the accident, she was not the only defendant in the *McNaughton* case. As noted above, the McNaughtons also joined Sealy as a jointly and severally liable defendant. This fact, or course, presented the possibility that Mrs. Fortney would not be held solely liable for Mr. McNaughton's injuries so long as it was determined that at the time of the accident she was acting in the scope of her employment.

Mr. Gudenau, was aware of the importance of this possibility because he knew that Mrs. Fortney personal automobile insurance had a maximum payment of $250,000, and that Mr. McNaughton's injuries clearly exceeded this limit. In his deposition, Mr. Gudenau explained that he gave the following advice to Mrs. Fortney on the vicarious liability issue:

Q. . . . Did you have a procedure that you followed with Mrs. Fortney wherein

liability was a conceded matter [and] her coverage was apparently inadequate to cover the exposure, as to what you could or could not do for her or what you would or would not tell her in that regard? In other words, how do you handle a person who is facing an excess?

A. You advise them accordingly.

Q. And what did you advise her?

A. I advised her at various times subsequent to [her] deposition that Sealy was going to be brought in as a defendant, and I told her that would be to her advantage if in fact [the McNaughtons] could tie [Sealy] into the litigation. I indicated to her until things further developed, I would not know whether or not, or what would happen in regards to her exposure, personal exposure.

Q. Did you—

A. And her obvious underinsurance, which she recognized.

Q. Did you recommend that she get another attorney or did you suggest that she did not need another attorney or did you even raise the subject?

A. At that point in time we are talking about her deposition, and right after her deposition I think I indicated to her that she should wait to hear from me further in that regard.

Defendants' Brief, Ex. B, pp. 21–22.

Mr. Gudenau also stated in his deposition that he did not believe that there was a factual basis upon which to hold Sealy vicariously liable:

Q. [T]here was no factual basis to hold in Sealy?

A. Obviously not a question I can answer with a yes or no, but I will try to answer as follows.

Q. Please.

A. Mrs. Fortney testified, has testified now three times under oath to the direct question were you or were you not in the scope and course of your employment at the time, and she answered I was not.[2]

---

**2.** There are only two statements by Mrs. Fortney

with regard to her beliefs about whether she was

Q. At the time of impact?

A. At the time of impact. During that trip, the whole course of time she testified she was not in the process of doing anything for the benefit of her employer. She made that very clear to me during our meetings and our telephone conversations. That is number one.

Number two, Mr. Glass did a rather superficial examination of her actions leading up to the impact to try to establish a factual basis for that. I say superficial because he really did not discover all of the information that I was aware of that subsequently Mr. Geary in the *Greer* litigation became aware of, and therefore, voluntarily dismissed [Sealy] from that lawsuit.[3] I can only say that there is no information that I am aware of, and there is no interpretation of any

facts that I am aware of that were not introduced at the time of trial in this case, but for one or two, which further confirm that she was not in the scope and course of her employment.

Defendants' Brief, Ex. B, pp. 26–28.

Mr. Gudenau also pointed out in his deposition that he knew that Mrs. Fortney was worried about how her actions in the course of the *McNaughton* litigation would be perceived by Sealy:

[S]he was very concerned throughout all of these proceedings that she would somehow be viewed as a ne'er-do-well by her employer if she testified improperly, quote-unquote, improperly, whatever that means. She was afraid of whatever it was she said or did not say. She wanted to keep her job. As you mentioned, she was a sole

acting in the scope of her employment at the time of the accident that are in the record. The first has been quoted above. The second, made in a deposition taken on December 22, 1992, is set out below:

Q. [A]t the time of the accident, were you engaged in activities as an employee for your employer?

A. No.

Q. Do you know of any evidence, documents or testimony or witnesses that would support a position that you were engaged in work at the time of the accident for your employer?

A. No.

Defendants' Brief, Ex. G, pp. 9–10.

3. Mr. Gudenau is referring here to a second suit brought by a Mrs. Greer against Mrs. Fortney and Sealy as a result of the August 24, 1989 accident. According to Mr. Gudenau, the *Greer* case settled after Mrs. Greer's counsel, Paul Geary, discovered diary entries made by Plaintiff which (for reasons the Court cannot clearly glean from the record) further undermined a finding of vicarious liability on the part of Sealy. Mr. Gudenau testified:

Q. The subsequent facts that became available to Mr. Geary that ... Mr. Glass did not find, what were they?

A. Those are the facts which you now have in your possession which we produced to you pursuant to your request for production of documents, and that is Mrs. Fortney's diary. During the course of the *Greer* litigation, as was explained to me by Mrs. Fortney during the McNaughton litigation, she had a relationship with a Mattress Warehouse, one of her

clients, whereby she would, and I am going from memory now, service that client specifically every Thursday, let's say. And she would call in advance the woman who was the owner, make the appointment, and it was always a Thursday. The diary which we produced for you, her diary, Mrs. Fortney's diary, clearly indicates that not only that fact is true but that this accident happened on a Tuesday.

In addition to that, Mr. Geary, who has the diary, got the diary, also took the deposition of the owner of the Mattress Warehouse to confirm that information. None of that was done by Mr. Glass prior to trial in the *McNaughton* case.

See Defendants' Brief, Ex. C., pp. 28–29. Mrs. Greer dismissed Sealy from her case and settled with Plaintiff for $100,000. *See id.* at 13.

The Court must note that despite Mr. Gudenau's testimony above, it is undisputed that the accident did, in fact, occur on a Thursday. Furthermore, it should be noted that Mrs. Fortney's diary is not part of the record, so it is difficult to evaluate what evidence it contains. Finally, the record does contain Mrs. Fortney's calendar for the month of August, 1989, and this calendar indicates that on the last three Thursdays of the month, Mrs. Fortney attended parties at Mattress Warehouse. *See Plaintiff's Response Brief*, Ex. G. No Mattress Warehouse entries appear on any of the Thursdays of August.

Despite the evidence in the calendar, the Court is unable to verify Mr. Gudenau's presentation of what additional evidence that he knew of and that appeared in the *Greer* litigation which further suggested that Mrs. Fortney was not acting on behalf of her employer when the *McNaughton* accident occurred.

breadwinner.[4] So that was, that emotional overlay was present throughout.

Defendants' Brief, Ex. B, p. 68. Despite any misgivings Mrs. Fortney may have had about taking an adverse posture to her employer, there is no evidence in the record that Mrs. Fortney ever instructed Mr. Gudenau not to pursue a vicarious liability strategy in the *McNaughton* litigation.

Despite the large liability that Mrs. Fortney faced in the *McNaughton* case, Mr. Gudenau pursued a seemingly less than vigorous approach to the case. For example, he did not attend the *de bene esse* depositions of physicians taken by the McNaughtons as part of their construction of damage proofs. Mr. Gudenau explained this action in the following way:

Q. Did you attend [the *de bene esse* depositions of the McNaughtons' doctors]?

A. No, I did not.

Q. Why not?

A. Well, there were several reasons for that. Number one, my tactic at one point when it was determined that Mr. Glass was not going to accept Mrs. Fortney's policy limits, my tactic was to try to somehow focus the argument between, the argument between those two parties.

Q. I am sorry, those two parties being who?

A. The [McNaughtons] and Sealy.

Q. Sure.

A. So that while there was no real evidence that she was in the scope and course of her employment, I was hoping that somehow we could persuade the jury, if you will, that somehow she was so we could benefit from that. So that was, that was my first and foremost tactic in this case, because she was obviously underinsured in this case.

＊　　＊　　＊　　＊　　＊　　＊

A. The other thing is the [McNaughtons] went to credible doctors at the University of Michigan, doctors I felt were credible, and his injuries, I thought, were very clear-cut. The doctors' reports that I saw in advance of the depositions were not embellished. That was number two. I did not think we would gain a lot by doing any cross-examination. In fact, I thought that if I went to those depositions, I would somehow undermine my credibility in the eyes of the jury if I started to nitpick with those doctors.

And one of the final reasons was that I had an agreement with the attorney for Sealy that I would basically handle the economists on cross-examination and he would handle the doctors.

Defendants' Brief, Ex. C, pp. 24–26.

Prior to trial, Sealy and the McNaughtons filed cross-motions for summary disposition on the issue of whether Mrs. Fortney was acting in the scope of her employment at the time of the accident. Judge Colombo denied the motions on April 19, 1991, with the following reasoning:

Fortney testified that on the day of the collision she was employed by Sealy as a sales representative. Fortney stated that she was a marketing specialist, and her duties included selling products. Fortney indicated that she sells to retailers and travels to retail outlets to acquaint retailers with Sealy's products. Fortney testified at the time of the collision she was not working. She stated that she had left her home on her way down to a warehouse on Northline Road to pick up a futon. On the way, Fortney stopped at the Mattress Warehouse in Livonia. This was the only call she intended to make because she had company coming into her home that day. She then proceeded to the warehouse to pick up the futon. On the way to the warehouse the collision occurred. Fortney had intended that upon returning to her home, where her office is located, she would have called into Sealy for any telephone messages.

In *Ten Brink v. Mokma*, 13 Mich.App. 85, 87, 163 N.W.2d 687 (1968), a panel of the Court of Appeals adopted the following

---

**4.** Mrs. Fortney's husband is a hemophiliac, and, apparently, he does not work. *See* Defendants' Brief, Ex. C, p. 6.

test for determining whether an employee was acting within the scope of employment:

> If the work of the employer creates the necessity for travel, he is in the course of employment, though he is serving at the same time some purpose of his own. If, however, the work is merely incidental to the travel, and the trip would not have been made but for the private purpose of the servant, he is out of the scope of his employment in making it.

Where the facts are not in dispute and where no conflicting inferences may reasonably be drawn therefrom, the determination of whether the employee was acting within the scope of his employment is for the court. *Rowe v. Caldwell*, 67 Mich.App. 543, 550 [241 N.W.2d 284] (1976). Plaintiffs argue that the above testimony of Fortney establishes that the nature and impetus of the trip was of a business nature despite the incidental personal errand of picking up the futon. Sealy argues that the testimony of Fortney establishes that the stop at the [Livonia] Mattress Warehouse was merely incidental to the personal purpose of the trip.

In *Long v. [McKay]*, 295 Mich. 494 [295 N.W. 239] (1940), the Michigan Supreme Court affirmed a decision for the plaintiffs who were injured in an automobile collision with the defendant. The defendant was employed by Curtis Publishing Company. He went to Chicago on a business trip for Curtis. After the business was completed, the defendant visited his son at the University of Evanston on Saturday. The defendant also visited at the University of Evanston on Sunday. Upon defendant's return home, he was involved in the collision with the plaintiffs. The Michigan Supreme Court noted that the trial court correctly ruled that it was an issue of fact for the jury to determine whether defendant was in the course and scope of his employment with Curtis.

5. The only evidence on this issue, introduced by the McNaughtons, was Plaintiff's deposition testimony quoted above.

In the instant case, the testimony can be looked at two ways. One, the personal trip was incidental to the work. In the alternative, it could be viewed that the work was incidental to the personal trip.

In addition, Fortney's mediation summary indicates that she was in the course and scope of employment, but her deposition testimony denies that this is true.

\*    \*    \*    \*    \*    \*

For all these reasons, there are clearly questions of fact that need to be resolved by the jury. Both motions for summary disposition under M.C.R. 2.116(C)(10) are denied.

Plaintiff's Response Brief, Ex. E, at 4–7.

Trial in *McNaughton v. Fortney* commenced in November, 1991. Consistent with her deposition testimony, Mrs. Fortney conceded that her negligence was the proximate cause of Mr. McNaughton's injuries. Therefore, the only issues litigated at trial were whether Mrs. Fortney was acting within the scope of her employment and what was the extent of the McNaughtons' damages.

Despite Judge Colombo's ruling that a material question of fact existed on the issue of whether Mrs. Fortney was acting in the scope of her employment at the time of the accident, Mr. Gudenau did not introduce any evidence suggesting that Mrs. Fortney was so acting.[5] Rather, he limited his participation to undermining the McNaughtons' damage proofs. Mr. Gudenau's reasoning behind his decision not to introduce vicarious liability proofs was, first, that he was under no duty to defend Mrs. Fortney on the issue of vicarious liability because those allegations were directed solely at Sealy and not his client. Furthermore, Mr. Gudenau did not think that he could add anything to Mr. Glass' proofs on vicarious liability, especially in light of his client's testimony that in her opinion she was not working at the time of the accident. *See* Defendants' Brief, Ex. B, pp. 39–40.

It should be noted that Judge Colombo again denied Sealy's motion for directed verdict on the agency issue at the close of the McNaughtons' proofs.

Mr. Gudenau also made a series of questionable trial decisions. Most importantly, he advised his client not to even attend the trial. In his words:

Q. Okay. Why did you have the defendant stay away from the courthouse in this case and not testify in any regard to her—well, it is obvious why you didn't have her testify. I will withdraw the question. Why did you have her stay away?

A. For a couple of reasons. The first reason, not in order of priority, but the first reason that comes to mind is there was a reference in her letter that was part of the earlier exhibits during Mr. McClarty's deposition, she was very emotionally upset about this whole affair.[6] She was very despondent about the injury that she had caused. As a matter of fact, she told me specifically during the course of the trial to make sure you tell the plaintiffs personally that I am sorry. That is number one. I didn't think that she would make a great witness because of her emotional state.

[Secondly], she could offer nothing. We had admitted liability so technically there is no question really to ask her. *However, the most important reason I guess I kept her away is because I was using her as a shield in playing both ends against the middle. I had kept telling both Mr. Glass and Mr. Maish [Sealy's attorney] that I was going to bring her in and I anticipated divergent testimony, depending on who I was talking to. I told, I tried to persuade Mr. Glass that she was going to come in and support the fact that she was not in the scope of her employment, so that he would take my [$250,000] and go against Sealy. I then told Mr. Maish outside the presence of Mr. Glass that I thought she was going to come in and refresh her memory that she was in the scope of her employment and testify in that regard so that he would get hit so*

*that he again would take my [$250,000] and assume our defense.*

And, finally, most importantly, I knew that if I had her there, someone would call her as a witness, having not subpoenaed her, someone would have the benefit of calling her as a witness, someone was going to gamble and say I want to call Mrs. Fortney. And I knew that she was going to testify again in court that she was not in the scope of her employment which would again undermine her chances at getting Sealy's, the benefit of Sealy's policy. That was the ultimate decision.

Defendants' Brief, Ex. B, pp. 47–50 (emphasis added).

Mr. Gudenau also neglected to make an opening statement. He explained this decision with these words:

Q. Would you tell me, please, why you waived getting an opening statement in the actual trial?

A. For a couple of reasons. Number one, liability was admitted by us so there was nothing to talk about about liability. Number two, the damages far exceeded under everyone's evaluation the $250,000 policy, so there was not a lot I could say about that. But primarily it was part of my ongoing tactic to focus the jury's attention not on Mrs. Fortney, but on the argument between Sealy and [the McNaughtons], so that possibly [the jury] could find [Sealy] liable and make us the benefi[ciary] of that excess coverage.

Defendants' Brief, Ex. C, p. 31.

Mr. Gudenau further asked Judge Colombo, in the presence of the jury, if he could be excused during the video playback of the McNaughtons *de bene esse* depositions of their physicians. With respect to this decision, Mr. Gudenau testified as follows:

Q. Did you at any time leave the trial during its process while the jury was

---

6. In a letter dated October 27, 1992, to Catherine Bader, Mrs. Fortney's bankruptcy attorney, Mrs. Fortney stated with respect to her non-attendance at trial that "[d]ue to the stress and anxiety I was under, I was not present at the trial but

prepared to testify if called by Mr. Gudenau or Mr. Glass." Defendants' Brief, Ex. K. *See also* Plaintiff's Response Brief, Ex. D, p. 31 (Fortney January 28, 1992 deposition).

still listening to evidence and absent yourself from the courtroom?

A. Correct.

Q. Under what circumstances?

\* \* \* \* \* \*

A. The doctors' depositions had previously been taken and relegated to *de bene esse* videotape, so all the questions and all of the import by all of the attorneys was over and everyone was just going to sit there, the attorneys and everyone else were going to sit there and view the television screen, if you will.

Q. Okay.

A. So it was during that portion of the trial that I asked to continue in my subtle effort to focus the attention of the jury strictly on Mr. Maish and Mr. Glass, and I asked the judge at that point if I could be excused for that reason, as well as the fact that there was no other cross-examination or involvement by the attorneys.

Q. So you did have permission from the court to leave at that time?

A. That's correct. In the presence of the jury, too, I might add.

Defendants' Brief, Ex. C, pp. 69–70.

Lastly, there is evidence of record that Mr. Gudenau may have interfered with an attempt to settle the case. In the first settlement conference conducted by Judge Colombo months before the trial, Mr. Gudenau tendered the $250,000 insurance policy for Mrs. Fortney, and Mr. Maish tendered an additional $150,000 on behalf of Sealy. The McNaughtons rejected this offer and demanded $3.75 million. Mr. Glass represented to Judge Colombo, however, that he would recommend to his client a settlement package of $1.5 million. This figure represented the amount recommended by a mediation panel. *See* Plaintiff's Response Brief, Ex. C (March 6, 1991 mediation report).

Interestingly, Mrs. Fortney's mediation summary, prepared by Mr. Gudenau, apparently indicated that she was acting in the scope of her employment at the time of the accident. *See* Plaintiff's Response Brief, Ex. E, p. 6 (Judge Colombo's ruling on the cross-motions for summary disposition on the agency issue, quoted above). Thus, at least one point in the *McNaughton* litigation, Mr. Gudenau had pushed for a finding of vicarious liability.

Four days into the trial, Mr. Maish told Judge Colombo that Sealy would contribute $1.25 million, and that, therefore, the defendants together could come up with $1.5 million. Judge Colombo called Mr. Glass into his chambers and stated he had the $1.5 million. Mr. Glass, however, stated that his clients would not accept anything less than $2.5 million. *See* Defendants' Brief, Ex. E, pp. 14–15 (Colombo, J., deposition).

Finally, while the jury was deliberating, it asked for further instruction on the agency issue. Mr. Glass went to Mr. Maish and stated that he was interested in the $1.5 million settlement offer previously made. At this point, Mr. Glass testified, the following exchange took place:

Q. Do you have any factual basis or did you hear any discussions that would support th[e] allegation [of interference with the settlement of the case]?

A. Yes.

Q. Tell me what?

A. This was a discussion with Mark Maish, Mr. Gudenau, and I think Jeff Clark of this office was also present in the hallway after the question raised here by this pleading had been submitted by the jury in which we suggested to Maish or said, didn't suggest, said to him that we were interested in resolving the case based on the amount previously offered and the comment was, by Mr. Gudenau, was why should we settle with you now when, you know, when clearly the jury is considering their liability.[7]

\* \* \* \* \* \*

Q. Do you have any reason to believe anything that Mr. Gudenau may have said influenced Mr. Maish in any way?

*See* Defendants' Brief, Ex. B, p. 45.

7. Mr. Gudenau has denied making this comment.

A. I think Mr. Maish was a young lawyer who on several occasions told me of his respect and his thoughts that he considered Mr. Gudenau a good lawyer and so I—well, I haven't talked to Mr. Maish about it. Yes, I certainly would have reason to believe that such a statement like that by him about Mr. Gudenau would have an impact on him.

A last-second settlement was not reached, and the jury returned a verdict for $1,000,000 against Mrs. Fortney and a no cause of action against Sealy. Importantly, Mr. Maish has submitted an affidavit in which he states that Sealy would not have pursued an indemnity action against Mrs. Fortney had Sealy been found jointly and severally liable for her negligence. *See* Plaintiff's Response Brief, Ex. L.

As noted above, Mrs. Fortney's inability to satisfy the *McNaughton* judgment led her to file in bankruptcy. Shortly after she filed her bankruptcy petition on September 4, 1992, she met with Plaintiff's counsel, Lawrence Charfoos, to discuss the possibility of bringing suit against Defendants for legal malpractice. According to Mrs. Fortney, she felt threatened by statements made by Mr. Glass to her as conveyed by her first bankruptcy attorney, Gary Boren, that "[Mr. Glass] could make my life pretty miserable" if she did not meet with Mr. Charfoos. Defendants' Brief, Ex. G, p. 7. Mrs. Fortney conveyed her distaste for her interview with Mr. Charfoos in an October 27, 1992 letter to her second bankruptcy attorney, Catherine Bader. That letter states, in relevant part:

I don't know if Dale Gudenau did anything wrong.

Due to pressure from Gary Boren (my first bankruptcy attorney) and Mr. Glass, I went to see Mr. Charfoos. The first order of business was to settle an argument as to whom would receive the referral fee—Mr. Boren or Mr. Glass. This was before Mr. Charfoos even spoke to me about the case. It made me upset and ill. I answered a few questions and left as soon as possible. Attorney Richard Lehman of Lehman & Valentino was referred to me by my husband. I went to see him, and, after re-viewing what I knew about the case, he determined there was no reason to pursue a malpractice claim.

Other than the above, I have no other information I can think of to provide.

I don't know what constitutes a malpractice claim, but I feel comfortable with Mr. Lehman's advice.

Defendants' Brief, Ex. K, p. 2. Mrs. Fortney also testified in a deposition that she did not ask Plaintiff to initiate this suit on her behalf. *See* Defendants' Brief, Ex. G, p. 5.

Despite Mrs. Fortney's ambivalence with respect to the instant suit, Plaintiff initiated it on June 16, 1993, after consulting with Mr. Charfoos. Plaintiff admitted in his deposition that he did not undertake any independent investigation of the charges of malpractice other than his consultations with Mr. Charfoos. *See* Defendants' Brief, Ex. J, p. 44.

Plaintiff has retained an expert witness, David J. Cooper of Garan, Lucow, Miller, Seward, Cooper & Becker, P.C., to testify on the issue of whether or not Mr. Gudenau committed malpractice in his representation of Mrs. Fortney in the *McNaughton* case. The key portions of an affidavit that he prepared for Plaintiff's response brief state the following:

9. The Defendants were under a duty to be aware that a verdict in excess of $250,000 against Mrs. Fortney, only, would expose her personally for the excess over $250,000, and the Defendants had a duty commensurate with the standard of care for a civil negligence defense lawyer to exercise their best legal efforts to avoid having their client [become] the sole recipient of a verdict that predictably would be in the high six figures, or seven figures.

10. After having reviewed all of the pertinent materials in this case, I have previously provided counsel for the Plaintiff with the following opinion relative to the duty of defense counsel:

Thus, the duty of a reasonably prudent civil negligence defense counsel was to focus his approach to the case to attempt to persuade the jury that M[aridarlene] Fortney was "on the job" when the acci-

dent occurred. The appellate decisions referring to sales personnel who drive an automobile as part of their sales duties are relatively liberal in their language and scope. In addition, there is a line of cases that stand for the proposition that if the employer derives any *benefit* from the activities of the employee that the trier of fact is justified in finding the employee in the course and scope of his or her employment. The job of defense counsel in the *McNaughton* case was to marshal as many facts as possible to give the jury a basis upon which to find that Maridarlene Fortney was, *in a broad sense, on the job when the accident occurred.*

Part and parcel of accomplishing this would be to personalize and humanize Maridarlene Fortney to the jury, *as a known human being,* in contrast to the impersonal Sealy corporation. As we all know, no matter what side of counsel table we sit at, being able to prevail on difficult fact questions hinges as much on the jury getting to know your client, so as to be able to empathize with her or him, as it does on the facts themselves. The jury must see and hear the client, and step into the client's shoes, in order to be able to identify and empathize.

\* \* \* \* \* \*

11. In the conduct of the trial, Mr. Gudenau failed to do the following: he made no opening statement, either at the opening of the trial or at the beginning of his proofs; he instructed his client, Maridarlene Fortney, that she need not be present during the trial at all, and she was not present any time during the trial; he did not call Maridarlene Fortney as a witness in order to elicit testimony from her; he did not offer tax returns which would have reflected that 88% of her total mile-

age the previous year had been course of employment mileage; [8] he absented himself from the courtroom during the presentation of damage testimony, sending a signal of "indifference" to the damages to the jury; [and] in closing argument, he did not even mention the subject of his client having been in the course and scope of her employment at the time of the accident. The failure to do so in closing argument in particular must be viewed in the context that Mr. Gudenau argued after the attorney for the Sealy Mattress Company argued, during which he more or less challenged Mr. Gudenau to explain why she was in the course of her employment at the time of the accident.[9] Silence at that point was essentially an admission of the key issue in the case.

12. Based on an interview with Maridarlene Fortney, if Mr. Gudenau had probed a bit with her, he would have learned that the Mattress Warehouse located in Livonia that she had visited just before the accident, and which it was conceded was an employment visit, was owned by the very same person who owned the Mattress Warehouse to which Maridarlene Fortney was travelling when the accident occurred. That owner was named Joann Kristal. Part of Maridarlene Fortney's job was to engage in public relations with the owners and managers of the various outlets she serviced. Her other two major clients were Hudson's and Montgomery Ward's, with the Mattress Warehouse chain, owned by Joann Kristal, being her third largest client. She was on her way to the Mattress Warehouse outlet in Taylor to pick up a futon from Joann Kristal, the owner, when the McNaughton accident occurred. She had elected to purchase a futon from Mattress Warehouse because of the close business relationship she had de-

---

**8.** This fact is not in the record except for Mr. Cooper's affidavit. Mr. Cooper has stated, however, that "[i]f called as a witness in this case, I could testify to the facts and opinions stated in this Affidavit." *See* Plaintiff's Response Brief, Ex. K, p. 8.

**9.** Mr. Gudenau did state in his closing the following:

I'd also like to make a quick statement about the performance of Mr. Glass and Mr. Clark as well as Mr. Maish in representing their clients. I think they have done a very professional job. They have dealt with the issues, I think, in detail regarding in the course of and not in the course of employment.... I am certainly not going to rehash that.

Plaintiff's Response Brief, Ex. F, p. 74.

veloped with Joann Kristal. Although she was not strictly going to the Taylor Mattress Warehouse "on business," she would have charged her mileage from Livonia to Taylor on her income tax return as a business deduction because the trip would have impacted on her overall relationship with the Mattress Warehouse organization. The impact would have been of a public relations nature because of her relationship with the owner, Joann Kristal.[10]

Plaintiff's Response Brief, Ex. K (emphasis in original). Defendants have not yet offered any expert testimony rebutting Mr. Cooper's opinion that Mr. Gudenau's defense of Mrs. Fortney fell below the standard of care for lawyers in his situation.

### III. ANALYSIS

#### A. THE STANDARDS GOVERNING CONSIDERATION OF A MOTION FOR SUMMARY JUDGMENT.

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

Three 1986 Supreme Court decisions— *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)—ushered in a "new era" in the standards of review for a summary judgment motion. These cases, in the aggregate, lowered the movant's burden on a summary judgment motion.[11] According to the *Celotex* Court:

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who

fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

*Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552.

After reviewing the above trilogy, the Sixth Circuit established a series of principles to be applied to motions for summary judgment:

[*] Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

[*] The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case.

[*] This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case. * * *

[*] The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

[*] The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

[*] The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is "implausible."

*See Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir.1989) (footnotes with

---

10. None of the facts alleged by Mr. Cooper in this paragraph are otherwise found in the record. Mr. Cooper has stated, however, that "[i]f called as a witness in this case, I could testify to the facts and opinions stated in this Affidavit." Plaintiff's Response Brief, Ex. K, p. 8.

11. "Taken together the three cases signal to the lower courts that summary judgment can be relied upon more so than in the past to weed out frivolous lawsuits and avoid wasteful trials." 10A Charles A. Wright et al., *Federal Practice & Procedure*, § 2727, at 35 (Supp.1994).

citations omitted). The Court will apply the above principles in deciding Defendants' motion for summary judgment.

## B. *THE PARTIES' ARGUMENTS.*

Defendants argue first that Mr. Gudenau was under no duty to defend Mrs. Fortney on the vicarious liability count of the McNaughtons' complaint because this charge was directed at Sealy, not Mrs. Fortney. As part of this contention, Defendants assert that the question of what duty is owed to a client in a legal malpractice case is an issue for the Court.

Defendants further argue that there were no facts supporting a finding that Mrs. Fortney was indeed acting in the scope of her employment at the time of the accident.[12] Moreover, even if Mrs. Fortney had been held jointly and severally liable for the McNaughtons' damages with her employer, she would still have faced full liability for her actions by virtue of the joint and several nature of such a judgment, or, alternatively, as a result of an indemnity action against her by Sealy for any damages that it had to pay because of her negligence. Thus, Mrs. Fortney would not have been in a better position had Mr. Gudenau attempted to prove that she was acting within the scope of her employment. Finally, Defendants argue that Mrs. Fortney's admissions that she was not working at the time of the accident estop her from litigating the question of legal malpractice because it was these admissions, and not any actions on the part of Mr. Gudenau, which were the proximate cause of the judgment of sole liability against her in the *McNaughton* case.

Plaintiff responds first by stating that Mr. Gudenau's duty to represent Mrs. Fortney extended to the vicarious liability issue once that became an issue in the case. Plaintiff also contends that in cases such as this one, the questions of duty and breach are ones of fact requiring the submission of expert testimony. Plaintiff relies further upon Mr. Cooper's reflections that (1) Mr. Gudenau owed a duty to Mrs. Fortney to ensure that she

would not have to pay more than her insurance policy and that this duty included introducing proofs that she was acting within the scope of employment at the time of the accident; (2) that such proofs existed in the form of Mrs. Fortney's live testimony regarding the events leading up to the accident, her mileage log, and her relationship with the Mattress Warehouse chain; and (3) that Mr. Gudenau should have taken steps at trial, such as simple attendance with his client, which would have shown to the jury that both he and his client cared about the case. Plaintiff also contends that in cases such as this one, proximate cause is sufficiently demonstrated by evidence indicating that but for an attorney's negligence, the represented party would not have suffered as adverse a judgment as he did receive. Plaintiff finally asserts that Sealy's indemnity rights against Mrs. Fortney are not a defense in this case because Sealy's counsel has represented in a sworn affidavit that his client would not have pursued an indemnity action against her had it been found jointly and severally liable.

## C. *MATERIAL ISSUES OF FACT EXIST ON THE QUESTION OF WHETHER MR. GUDENAU COMMITTED MAL-PRACTICE IN HIS REPRESENTA-TION OF MRS. FORTNEY.*

■ In Michigan, a plaintiff alleging legal malpractice has the burden of proving all of the following elements:

(1) the existence of an attorney-client relationship;

(2) negligence in the legal representation of the client;

(3) that the negligence was a proximate cause of an injury; and

(4) the fact and extent of the injury alleged.

*Coleman v. Gurwin*, 443 Mich. 59, 503 N.W.2d 435, 436–37 (1993) (footnotes omitted). *Coleman* also establishes the extent of an attorney's duty to his client: "Whenever an attorney or solicitor is retained in a cause,

---

12. Defendants interpret Mr. Gudenau's testimony regarding Mrs. Fortney's diary to "confirm[] that Mrs. Fortney did not make any calls on clients before or after the accident." Defen-

dants' Brief, p. 15. As noted *supra* n. 3, the Court does not find Mr. Gudenau's testimony to be so clear on this point.

it becomes his implied duty to use and exercise reasonable skill, care, discretion and judgment in the conduct and management thereof." 503 N.W.2d at 436 n. 5 (quoting *Eggleston v. Boardman*, 37 Mich. 14, 16 (1877)).

■■■ Defendants correctly assert that the question of an attorney's duty to his client is one of law. *See, e.g., Friedman v. Dozorc*, 412 Mich. 1, 312 N.W.2d 585, 590–91 (1981) (holding that question of whether attorney for one client has duties of care to client's adversary is a question for the court). However, Defendants err when they state that Mr. Gudenau's duty to Mrs. Fortney did not extend to the vicarious liability count because she was not named in that count and because it did not fall within the attorney-client relationship.

■■■ With respect to the first argument, a defense counsel's duty is to defend against liability and/or to mitigate any losses. *See Coleman, supra.* Clearly, a joint and several judgment would have mitigated Mrs. Fortney's losses compared to a sole liability judgment because the McNaughtons would have had a collectible defendant, Sealy, for any damage recovery above Mrs. Fortney's policy limits, and it would have been up to Sealy to pursue a separate indemnification action against her.[13] Thus, common sense dictates that Mr. Gudenau's duty to Mrs. Fortney extended to the vicarious liability count even if she was not named in that count.

■■■ Similarly, the Court believes that there can be no question that Mr. Gudenau and Mrs. Fortney entered into an attorney-client relationship on the vicarious liability count as well as the negligence count in the *McNaughton* complaint. Defendants, in opposing this contention, rely upon Judge Feikens' decision in *Jackson v. Pollick*, 751 F.Supp. 132 (E.D.Mich.1990), *aff'd* 941 F.2d 1209 (6th Cir.1991). However, this case clearly does not apply to the present facts.

13. This possibility is discussed *infra*.

14. It bears noting that it is well-settled law in Michigan that in cases in which an insurance carrier hires counsel to defend an insured, it is the insured and not the carrier who is the client.

In *Jackson*, Judge Feikens granted summary judgment to an attorney and his law firm in a malpractice action on the ground that there was insufficient evidence that defendant/attorney agreed to represent plaintiff with respect to a reverse discrimination claim as well as a workers compensation claim. Defendant/attorney testified that he agreed to represent plaintiff only on the workers compensation claim and that he informed plaintiff that he had no expertise beyond that area. 751 F.Supp. at 133. Plaintiff countered that defendant never told him that he would not represent him on the reverse discrimination claim, and that, furthermore, his written inquiry to defendant asking him if he had any thoughts on the discrimination claim created a representation relationship on that claim. 751 F.Supp. at 134. Judge Feikens held that attorney-client relationships are contractual, and that a unilateral act by one of the parties, such as plaintiff's letter, did not constitute the mutuality necessary for a binding contract. 751 F.Supp. at 134.

Here, it is undisputed that Mr. Gudenau was hired by Farm Bureau Insurance Company to defend Mrs. Fortney in the *McNaughton* case pursuant to her insurance policy.[14] Mrs. Fortney, then, paid consideration in the form of insurance premiums for any efforts Mr. Gudenau made, or should have made, to minimize her liability. Moreover, Mr. Gudenau took steps consistent with representing Mrs. Fortney on the vicarious liability issue. In Mrs. Fortney's mediation summary, Mr. Gudenau stated that Mrs. Fortney was acting in the scope of her employment. He also admittedly used the possibility of her testifying at trial as a means to force a settlement in which Sealy would cover most of the cost. And, perhaps most importantly, once he knew vicarious liability would be an issue in the case, he did not instruct Mrs. Fortney to retain another attorney on this issue, but instead he told her to "wait to hear from me further in that regard." Defendants' Brief, Ex. B, p. 22.

*See Atlanta Int'l Ins. Co. v. Bell*, 438 Mich. 512, 475 N.W.2d 294, 297 (1991) ("Court's have consistently held that the defense attorney's primary duty of loyalty lies with the insured and not the insurer.").

Mrs. Fortney, then, was at all times dependent on Mr. Gudenau's advice with respect to the vicarious liability issue in the *McNaughton* proceedings.

These facts, then, establish that an attorney-client relationship existed between Mrs. Fortney and Mr. Gudenau with respect to the vicarious liability issue, and the Court so holds. Summary judgment on the grounds that the attorney-client relationship did not extend to the entire complaint is, therefore, denied.

■ Turning to the element of negligence in a *prima facie* legal malpractice case, and focusing for now on the vicarious liability issue, the question becomes did Mr. Gudenau breach his duty to zealously represent Mrs. Fortney by failing to perform up to the standard of care for attorneys in his situation. Michigan law is well-settled that the answer to that question requires expert testimony, unless the negligence is so gross as to fall within the realm where ordinary lay people would say it was careless. *See, e.g., Law Offices of Lawrence J. Stockler, P.C. v. Rose*, 174 Mich.App. 14, 436 N.W.2d 70, 87 (1989) ("In a malpractice action, expert testimony is usually required to establish a standard of conduct, breach of that standard of conduct, and causation."), *ap. denied*, 434 Mich. 862, 450 N.W.2d 270 (1990); *Joos v. Auto–Owners Ins. Co.*, 94 Mich.App. 419, 288 N.W.2d 443, 444 (1979).

■ Plaintiff has met this expert testimony requirement by putting forward Mr. Cooper's affidavit. Moreover, the Court believes that this evidence creates serious material issues of fact with respect to whether Mr. Gudenau breached his duty of care by not introducing proofs or making arguments regarding the vicarious liability issue in the *McNaughton* trial. Mr. Cooper's affidavit demonstrates that Mr. Gudenau did not develop vicarious liability evidence that may have assisted Mrs. Fortney's position at trial. More specifically, Mr. Cooper emphasizes that Mr. Gudenau did not introduce Mrs. Fortney's live testimony regarding the events surrounding the accident, nor did he introduce the facts that she apparently claimed the miles travelled on the day of the accident as a business expense and that she

had a close professional relationship with the owner of the Mattress Warehouse chain. Furthermore, Mr. Gudenau's decisions regarding, for example, attendance at trial, also could have hurt her chances of receiving a joint and several judgment. Whether or not this conduct on the part of Mr. Gudenau fell below the standard of care for attorneys in his position will have to be resolved by the trier of fact.

■ Regarding the question of whether Mr. Gudenau's actions vis-a-vis the vicarious liability issue were a proximate cause of Mrs. Fortney's damages, it is important to note that Plaintiff need not establish that Mrs. Fortney would have completely prevailed in the *McNaughton* case but for Mr. Gudenau's allegedly negligent representation. Michigan courts have held that this rule, known as the "suit within the suit" doctrine, applies only in a limited number of situations, namely:

1. When a legal malpractice plaintiff's claim is not that he received a judgment of greater liability than he would have received if the attorney had acted in conformity with the standard of care, but, rather, that he received an adverse judgment in an otherwise successful claim because of the attorney's negligence. *See Stockler*, 436 N.W.2d at 77; *Knoblauch v. Kenyon*, 163 Mich. App. 712, 415 N.W.2d 286, 289 (1987) ("[I]n legal malpractice cases such as the instant one, where the client's injury is not the dollar amount of the judgment but rather the fact that he sustained an adverse judgment, the client must also show that but for the act or omission complained of he would have been successful in the underlying case.").

2. "Where an attorney's negligence prevents the client from bringing a cause of action (such as where he allows the statute of limitations to run)." *Basic Foods, Inc. v. Grant*, 107 Mich.App. 685, 310 N.W.2d 26, 30 (1981).

3. "[W]here an attorney's failure to appear causes judgment to be entered

**602**

against his client." *Basic Foods*, 310 N.W.2d at 30.

4. "[W]here the attorney's negligence prevents an appeal from being perfected." *Basic Foods*, 310 N.W.2d at 30. *Cf. Charles Reinhart Co. v. Winiemko*, 444 Mich. 579, 513 N.W.2d 773, 777 (1994) (holding that issue of whether attorney's failure to perfect an appeal was the proximate cause of plaintiff's injuries was a question of law for the court because questions on appeal would be legal ones resolved by a court).

If, as in this case, a legal malpractice plaintiff's claim is that he would have suffered a different judgment of liability than the one he received as a result of his counsel's negligence, then that counsel may be held liable for the injuries caused by the more adverse judgment. The reason behind this rule was explained by the *Basic Foods* court:

We believe the "suit within a suit" requirement should, as a matter of sound policy, be limited to the types of cases we have described above. Requiring the plaintiff in all cases to show that he would have prevailed completely in the former action as a condition precedent to recovery in a subsequent malpractice action is a harsh requirement that would preclude otherwise meritorious claims. *If the attorney's negligence results in a verdict against his client that is larger than what would have been returned in the absence of his negligence, then the attorney should be held liable for the increased amount of the judgment.*

310 N.W.2d at 30 (emphasis added).

Proximate cause is often the most difficult element to prove in a legal malpractice case, and that will be no different for Plaintiff in this case. Nonetheless, the Court believes that questions of fact exist on whether Mr. Gudenau's decisions regarding the vicarious liability issue caused Mrs. Fortney to suffer damages.

As an initial matter to the determination of whether Mrs. Fortney would have been better off but for Mr. Gudenau's actions or omissions on the vicarious liability issue, there is evidence in the record that could lead a reasonable jury to conclude that Mr. Gudenau thought himself bound by Mrs. Fortney's unwillingness to alienate her employer by, at least in her mind, lying about the question of whether she was acting in the scope of her employment at the time of the accident. If the facts should show that Mrs. Fortney instructed or indicated to Mr. Gudenau that she did not want to pursue a vicarious liability defense because of her desire to remain in Sealy's employ, then his failure to pursue this line of inquiry is her fault and not his.

However, at this juncture of the proofs, there is insufficient evidence of record for the Court to hold as a matter of law that Mr. Gudenau was only following his client's wishes in not pushing the vicarious liability issue. While Mrs. Fortney did convey to Mr. Gudenau that she did not want to appear as a "ne'er-do-well" to Sealy, there is no record evidence that she ever instructed him to avoid proving or arguing vicarious liability in the *McNaughton* proceedings.

Another causation question with respect to the vicarious liability issue is whether Mrs. Fortney's live testimony and/or the introduction of documents such as her travel log or tax returns would have resulted in a finding of joint and several liability with her employer. The jury in the *McNaughton* case was clearly troubled by the agency question, as indicated by their request for further instruction on the matter during their deliberations. Because of this fact, the Court believes that a reasonable jury in this case could conclude that had Mr. Gudenau put on vicarious liability proofs, Plaintiff would have been held jointly and severally liable rather than solely liable.

Entirely separate from the questions of material fact on the elements of negligence and proximate cause with respect to Mr. Gudenau's litigation of the vicarious liability issue is another set of questions. That second category of issues revolves around whether Mrs. Fortney suffered a higher sole liability judgment than she would have otherwise because of his decisions (1) not to have Mrs. Fortney present at trial, (2) not to make

an opening statement, (3) not to attend the entire trial himself, and (4) not to push for, or at least avoid interfering with, a last-second effort to settle the case while the jury was deliberating. Regardless of the vicarious liability issue, the Court believes that a reasonable jury, aided by expert opinion, could conclude that one or all of these acts prompted a sole liability verdict against Mrs. Fortney which was larger than it would have been otherwise.

Mr. Gudenau must admit that the first three decisions noted above likely presented his client in a highly negative light to the *McNaughton* jury. Moreover, if the facts show that Mr. Gudenau interfered with a $1.5 million settlement which would have left his client contributing only $250,000 by recommending to Sealy's counsel that he not settle—especially when Mrs. Fortney had already conceded negligence and proximate cause, and, thus, faced some liability regardless of Sealy's status—then a reasonable jury would be well within the evidence to find that Mr. Gudenau negligently failed to act in his client's best interests.[15]

■ The final element in a *prima facie* legal malpractice case is damages. Plaintiff has shown that Mrs. Fortney's damages, if any, are in the form of having a sole liability judgment as opposed to a joint and several liability judgment, and, possibly, having a larger sole liability judgment than would have otherwise occurred but for the malpractice. Thus, the Court believes that Plaintiff has provided sufficient evidence of this element of his *prima facie* case to avoid summary judgment.

None of Defendants' arguments persuade Court that this case is ripe for summary judgment. The Court has already rejected their argument that Mr. Gudenau's duty to Mrs. Fortney did not extend to the vicarious

liability issue. Similarly, Defendants' assertion that there was no evidence supporting a finding that Mrs. Fortney was acting within the scope of her employment at the time of the accident is meritless. While the question was a close one, there was evidence in the record supporting a finding of vicarious liability. This fact is evidenced by Judge Colombo's rulings, and the Court believes that given the contradictory evidence, he properly submitted the question of vicarious liability to the *McNaughton* jury.

Defendants also contend that Mrs. Fortney would have been in the same position she is in now regardless of a finding of joint and several liability. This contention, however, is undermined by Mr. Maish's affidavit that indicates that Sealy would not have held Mrs. Fortney liable for more than her $250,000 insurance policy. Given this affidavit, the Court believes that a reasonable jury could conclude that Mrs. Fortney would have been in a better position had the *McNaughton* jury come back with a finding of joint and several liability. Moreover, as noted above, the Court believes that a reasonable jury could also conclude given the current evidentiary record that Mr. Gudenau's lackadaisical approach to the trial resulted in a higher judgment against Mrs. Fortney than would have resulted had he pushed himself and his client into a more active trial stance.

■ Finally, just because Mrs. Fortney testified that she was "not working" or not engaged in activities on behalf of her employer at the time of the accident does not mean that the issue of vicarious liability was conceded. Even though Mr. Gudenau may have in good faith believed that there was no issue on vicarious liability when the case began, Judge Colombo's summary disposition and directed verdict decisions clearly put him on notice that Mrs. Fortney's opinion was not

---

**15.** Inherent in all this is the disturbing question of the extent to which Mr. Gudenau's relationship with Farm Bureau Insurance played a role in his decisions as to the vigor with which he pursued the representation of Mrs. Fortney. Obviously, Mr. Gudenau was retained by Farm Bureau to represent Mrs. Fortney. Just as obviously, Farm Bureau and Mr. Gudenau knew that Mrs. Fortney at best would be jointly and severally liable for the entire judgment—and that Farm Bureau would be surely responsible for $250,000, but *only* $250,000, of that amount. The disturbing question, then, is whether Mr. Gudenau, having been hired by Farm Bureau and not Mrs. Fortney, and knowing with certainty that Farm Bureau would be liable for the $250,000 in the policy, attempted to minimize Farm Bureau's overall exposure, including defense costs, by minimizing his efforts.

dispositive on this issue. The Court similarly believes that Mrs. Fortney's unschooled statements do not preclude a finding by a reasonable jury in this case that, had the *McNaughton* jury been confronted with Mrs. Fortney's presence at trial, live testimony, and/or the introduction of documents supporting the contention that she was in the scope of employment at the time of the accident (albeit likely on a detour), that jury would have come back with a finding of joint and several liability and/or a finding of lesser sole liability against Mrs. Fortney.

The cases Defendants cite in support of this last argument are distinguishable. In *Schlumm v. Terrance J. O'Hagan, P.C.*, 173 Mich.App. 345, 433 N.W.2d 839 (1988), the Michigan Court of Appeals heard a case in which plaintiff's primary allegation was that his attorney committed legal malpractice by incorrectly advising him that if he pled guilty to a crime he would only receive a sentence of one to three years imprisonment. Plaintiff, after pleading guilty, received ten to twenty years incarceration. 433 N.W.2d at 841–42.

The *Schlumm* court nonetheless held that plaintiff's complaint did not state a claim upon which relief could be granted because he did not plead "that, but for his attorney's negligence, he would have received a lighter sentence." 433 N.W.2d at 847. Rather, according to the court it was plaintiff's voluntary admission of legal guilt, and not defendant's bad advice, which on the face of the pleadings was the proximate cause of his lengthy sentence. 433 N.W.2d at 845–47.

Similarly, in *Bessman v. Weiss*, 11 Mich. App. 528, 161 N.W.2d 599, 600–01 (1968), *cert. denied*, 396 U.S. 1008, 90 S.Ct. 564, 24 L.Ed.2d 500 (1970), the Michigan Court of Appeals held that sworn statements by one of the plaintiffs in the malpractice action which were submitted by defendants/attorneys in an answer to a complaint in a prior federal court premium collection action estopped plaintiffs from suing defendants for the course of conduct that they took in light of those sworn statements. These statements were the basis for the federal court's grant of summary judgment to the opposing party in the prior action. Plaintiffs in *Bess-man* asserted that the relevant statements were untrue, and that, somehow, their lawyers had a duty to uncover that fact and to pursue another course of action. 161 N.W.2d at 600. The *Bessman* court quickly disposed of this argument:

> A complete examination of the pleadings and record before us leads us to conclude that the trial court properly entered summary judgment. The plaintiffs herein are faced with the fact that the answer filed in the initial case was a sworn answer relating many of the facts they now state to be untrue, and we find that their action of swearing to the veracity of the statements now estops them from suing on the course of conduct pursued by their attorneys.

161 N.W.2d at 600–01.

In the instant case, the Court cannot say as a matter of law that Mrs. Fortney's deposition testimony that, in her opinion, she was not working at the time of the accident was the proximate cause for the entire judgment against her in the same way that the *Schlumm* court held that plaintiff's guilty plea was the proximate cause of plaintiff's injuries in that case. First, the *Schlumm* court only looked at plaintiff's pleadings, not a fully developed record as in this case. Plaintiff's complaint here clearly sets out the allegation that Mr. Gudenau's allegedly lackluster defense of Mrs. Fortney resulted in a solely liable judgment rather than a joint and several judgment. Thus, Plaintiff in this case has met his pleading burden. Second, there is evidence in the record that Mrs. Fortney's testimony was not the sole proximate cause of the judgment against her, namely (1) Judge Colombo's rulings, which gave little weight to her unschooled opinion, (2) the *McNaughton* jury's struggle with the vicarious liability issue, and (3) Mr. Gudenau's failure to put on an active case at trial. Because of these facts, it is the Court's belief that a reasonable jury could conclude on this evidence that Mr. Gudenau's handling of the case at least in part contributed to Mrs. Fortney's disaster.

Moreover, the Court does not believe that Plaintiff is estopped from bringing this lawsuit by Mrs. Fortney's statement that she was not working at the time of the

accident. This is not a case, like *Bessman,* in which the plaintiff is changing her story from a prior action in order to make out a malpractice case. Mrs. Fortney has always believed that she was not working at the time of the accident, and, indeed she was not. But that is not the issue in this action. Instead, the question is was she in the scope of employment—a concept that all first-year law students learn is beyond the common, everyday notion of working for an employer. It is Mr. Gudenau's failure to recognize this distinction, and/or properly apply it to this case, which, in the Court's opinion, may lead a reasonable jury to conclude that he did not meet the standard of care required of attorneys in his position.

## IV. *CONCLUSION*

For the foregoing reasons,

NOW, THEREFORE, IT IS HEREBY ORDERED that Defendants' motion for summary judgment be DENIED. Trial of this matter before a jury shall proceed forthwith.